The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their final sitting. God save the United States and this Honorable Court. Thank you, please be seated. Welcome to the Fourth Circuit, and we are prepared to hear argument in our first case, AirFacts, Inc. v. Amezaga. Mr. Hanses, is that pronounced correctly? Hanses. Hanses. Yes. We'll be glad to hear from you. May it please the Court. Companies cannot succeed if there's no protection for their investment in their confidential information and documents. To protect confidential information, including trade secrets, AirFacts required the employees to sign an employment agreement that contained a clause that said you couldn't share confidential information with third parties, and that upon termination of employment, you had to return all confidential information. Mr. Amezaga signed that employment agreement, but contrary to those terms, he did not return confidential documents, including trade secrets. After termination, he obtained trade secrets through the use of passwords and a username to access trade secrets in an online storage device, and he shared trade secrets and other information with third parties in the same industry. AirFacts had no choice but to hire lawyers and forensic experts to file suit and track down and recover the confidential information and verify to the extent to which he had shared it with third parties. Included in what he took and disclosed to a third party was a fair by rule flowchart, which this Court ruled in the last appeal was a trade secret. The flowchart contained processing logic of AirFacts' ticket card process, which is a economic value because the expert arrangement of the data was unique and was information not available to others. Pursuant to count one of the complaints for breach of contract, AirFacts sought to recover attorneys' fees and expenses of tracking down the trade secrets and determining the breadth of the confidential information he had failed to return. The District Court, however, disregarded the rulings of this Court and found that it was in direct disregard of his contract provision and turned the flowcharts over to a third party. Did the District Court ever consider Section 3.2 of the agreement in deciding whether the appellee possessed implicit authority to keep the documents? Your Honor, the Court only exercised that determination with regard to one of the documents, not the flowchart, but only one document, and that was the proration framework document. The Court held that for purposes of that specific trade secret, which is different, of course, than the flowcharts, the flowcharts he got by using a password. He went into this online facility using a password and a username one month after his employment had been terminated. And the Court said... Your Honor, I want to get some clarity on where you're going. The flowchart argument you have is that they were trade secrets and that you should have received damages for the use of the trade secret. Is that your argument? There's two. We're entitled to damages pursuant to the breach of contract for his failure to return all the documents. And we're entitled... Those damages, the contract damages, are those that are envisioned by the indemnification clause, that if we spend money tracking down these documents, that you didn't return in conformance with this provision, and tracking them down from third parties... Some of the... I can never keep all these straight, but some of the documents, the District Court made a factual finding, or it might have been a finding of combined law, in fact, that Mr. Amasego had permission to retain the documents so that he could be consulted after his employment terminated. And that, therefore, he could not have violated, could not have breached the contract in that regard. So are you challenging that finding? I'm challenging that one as well. So that's the pro rata documents. So we just addressed the fair... So the pro rata, is that what was involved with the Alaska Airlines? Yes. Yes. And that's the document he was working... One of the documents he was working on when he left. So what's your claim on the pro rata documents? On the pro rata documents, this court found that they weren't misappropriated in the last... Affirmed the trial court's ruling in the last appeal that they weren't misappropriated under the Trade Secret Act. I don't think that ruling is binding with respect to breach of contract. A contract says you return the documents. Under the Trade Secret Act, you have to find misappropriation. Did the district court determine that he had the implicit consent to retain the pro rata documents? The court did find that. However, I think that implicit consent concept is contrary. In order to waive a contract right, you need an intentional relinquishment of a known right. That implicit authority isn't sufficient to satisfy that standard that applies in a contract case. I think opposing counsel says that under... I think this is right. Under Maryland law, there can be an oral modification of that type of contract, including by conduct, that would alter that term of the written contract. I don't... The case law that I cited and read, in my understanding of contract law, is that you have to have an intentional relinquishment of a known right that he should have returned. Does it require it to be in writing? If the district court made a factual finding that he was entitled to this and to keep these things, what's our authority to overturn that finding? Here is the integration clause, 10.3, that requires that any changes have to be in writing. Yes, 10.3, the agreement will not be modified to satisfy an agreement in writing. It has to be by the parties there, too. Furthermore, the provision that restricts... prohibits people from... employees from sharing the information or confidential information required the written explicit notice from the president of the company to be able to share it. So there's two clauses that would require a written finding. Did the district court even make an explicit royalty determination under that Maryland statute? The district court... that's moving to the damages we seek for the royalty under the misappropriation. The court made a finding that there was no right to royalty damages because of the commercial use requirement. And as the court in Stagecraft, Judge Gorshitz, Justice Gorshitz now, ruled that there is no requirement for commercial use in order to collect royalty damages in the case of a trade secret because the statute itself says mere disclosure is sufficient. In other words, you can recover for unauthorized disclosure without commercial use. Yes. Yes, and that's what the court held. That's what I think this court should hold, and that's what Stagecraft holds, and I think that's consistent with the law. Let's assume that Stagecraft's theory applies. What are your damages? Our damages were determined pursuant to the expert testimony of Ms. Riley, and she said that the damages could be between $3 million for a three-year license. It's $440,000 for a three-year license or $293,000 for a two-year license, and she calculated that the overall license fee was $3 million. She apportioned it only to 25%. However, I mean, I would, you know, if the court— Can I ask you, so where does that license fee, where does that number come from? The license fee comes from—they sell what they call their ticket guard software, which is their central asset that they use to audit tickets, and a portion of that software has what's on these flow charts. The processing logic for a portion of that software that is used in connection with that software is set forth in that trade secret that's the flow charts. And it's only the back end of the system that use that processing logic on the flow sheets and only a portion of that back end portion. And so she attributed only 25% to that, and she did that because only 25% to 27% of the tickets were used that part. That assumes that that would be the traditional commercial use of the license, and here your argument is that it doesn't matter whether it's commercial or not because the statute doesn't require it, but then you're using a commercial definition of damages to get to the royalties in this case. I think what I would rely on is the universal computing logic, which says when someone improperly— That requires commercial use, doesn't it? I don't think it requires—in order to calculate the damages based on the licensing, I think the point of the damages are that essentially Fairport, the company that he handed the logic over to, which by the way Fairport was free to give it to anybody else they wanted to. So you're devaluing the asset because it's a trade secret. You have to keep it confidential to have value. If it's disclosed to the commercial market, the value of the license is less, and I think it is a good proxy in any circumstance because while it's a secret, we get a licensing fee of a certain amount of money. If it's not a secret, that licensing fee is diminished, and I think it's a fair proxy. That is the impact of disclosing it, whether it's a commercial use or not. So I don't think it's an improper measure. Pat, can I take you back for a moment just to the issue of damages for the use of the various materials in this case, and in particular I want to focus on paragraph 6.1 of the employment agreement that talks about the damages, the requirement to indemnify your client for, as the clause says, resulting from or directly or indirectly arising out of any material breach of any material provision. So it's not just that the provision has to be material, but that the breach itself has to be material. So what is the material breach in this case? Well, the judge found that it was material. I sense from your question that you're aware of that. She found that the provision was material. Yes, there's no dispute about that. What I'm getting at is what's the material breach? The material breach is the breadth to which he used the documents, and he took multiple documents. The court recognized that it was a material breach when it entered an injunction. But the damages that you're primarily seeking are the expenses of investigating the breach, but that investigation didn't reveal any damage. So what's the breach? Well, it did reveal damage. It did. Well, I mean, that's a post hoc analysis. The obligation on my client with respect to a trade secret is to keep the trade secrets confidential or they lose their value. Part of that obligation to take reasonable steps to ensure that the trade secrets are protected is if they're disclosed to a third party, and you know that, you have to go get them. And so that is a natural consequence of damages that were – it's a material breach in that sense because we have to go out and expend the money to collect them. Whether or not at the end of the day the court, after we've gone out and collected all these documents and rooted through them and found out one by one some may or may not have been trade secrets or there may or may not have been damages because a third party didn't actually use them or a third party or he didn't actually use them, that's after the fact analysis that you don't consider in connection with the warning attorney's fees because the obligation is to go get them. Under Maryland law, isn't materiality a question of fact, and therefore our review of your claim about that would be clearly erroneous, wouldn't it? Well, I think that the law, the court did not apply the proper standard in determining whether there was a material breach because I've cited a Glenn v. Impact case, which is a case involving recovery attorney's fees for breach of a confidentiality provision and failure to return the exact same provisions as this case. And the Maryland court looked specifically to whether the parties contemplated that this would be a damage in the event of a disclosure. And I think that's the reason the court applied the wrong standard. But even though that language is in the contract, and this may repeat a question I asked earlier, the district court made a finding that the defendant was authorized to retain some of these documents so that he could be consulted after his appointment terminated. So in view of that finding, if he was authorized to retain the documents, how is there a breach of contract for the investigative expenses? And that sort of thing, if he was authorized to retain the documents. Because it was contemplated that if he didn't return them, I think the answer is that that is only with respect to one document that the court made up. Which one is that? The proration. And isn't that what you want the investigative expenses for, the proration documents, the Alaska Airlines stuff? No, I want it because we had to look for any documents. But the fair by rule flow chart, the court found without question that he shouldn't have taken it from the online service. And so there's no doubt about it that he went to the online service. He took them out of the online service. He took them out of the online service using the password that he was given. And when he took them out, after he was no longer working, he breached the clause. And the court specifically found that not only had he breached the contract there, but also he had misappropriated the document under the Maryland trade secret law. So with respect to that document, there's no question that he breached it. But I still thought – so there's no question about that document. And then the other document, she said, yeah, he breached it. There were four or five other documents. She said he breached it, but I think that document's worthless, so you shouldn't have spent the time and money to collect it. But that active effect analysis ignores the obligation of our client to go out and figure out what – I mean, essentially, if the course ruling is correct, the court has to try – the employer has to try to make a determination, oh, gee, we don't know what he has, but we have to spend the money to go out and find out what he has. And then once we find out what he has, we can't make a request for attorneys fees. I think you've answered the question. So your time has expired. You do have some remorse. Okay, thank you. Mr. Goldstein. Thank you, Your Honors. Good afternoon, and may it please the Court. This case was remanded to the district court to address only two issues, whether – you wanted a ruling on the merits on whether Amazaga breached Paragraphs 2.2 or 4.2 of his employment agreement with Airfax by improperly retaining any Airfax documents, and if so, whether Airfax was entitled to any damages as a result. And second, a ruling on whether Amazaga violated the Maryland Trade Secret Act by misappropriating two flow charts that he sent to Fairportal, and if so, whether Airfax is entitled to any damages as a result of that. In all other respects, this court affirmed the district court's first decision, or Airfax didn't even appeal the ruling. Airfax seems to think that just because this court remanded the case to the district court to rule on those two issues, that all the district court's findings relating to underlying facts and credibility of witnesses are invalid, and it can feel free to renew its arguments about all the facts involved from trial, and that's just not the case. The district court correctly ruled that the two old documents that were on Amazaga's electronic devices, which was his computer and his phone, specifically an old commission table from 2013 and a straight sales processing diagram from 2009, were entirely without consequence to Airfax. Lee Ying, Airfax programmer, testified that that straight sales processing diagram, for example, was outdated. It wasn't even useful anymore. In addition, the findings in the district court's first memorandum opinion about those old outdated documents are still valid binding. The court found that Amazaga was authorized to use Airfax documents to work from home just like everybody else. The documents had never been accessed since they were put on his devices years earlier, that Amazaga's testimony regarding forgetting that the old documents were on his devices was credible, and Airfax didn't appeal those findings. Those findings were made in the context of a Moosa claim, but they apply equally to Airfax breach of contract claim and especially to whether there was a material breach. Moreover, Airfax counsel in the closing argument trial stated that the old documents were only relevant to Amazaga's credibility and that they were not making a claim for them, but now they're trying to do exactly that. The prior rulings of the district court and this court on the proration spreadsheet, that's the thing that Amazaga mailed to himself to answer questions, are also binding on the breach of contract claim. Can I ask you about the proration documents? So paragraph 4.2 of the employment agreement pretty explicitly says that the employee has an obligation to return all documents, and it doesn't seem to provide any kind of exception, at least on the face of the contract. The district court ruled, though, that your client had at least implicit authority to retain the documents because he was told he might be called upon to render additional service or advice. But I don't see how the notion that someone might call him to ask him some questions somehow would lead a reasonable person to believe that he could retain documents. Let me finish. The agreement expressly says that he can't keep. Well, it wasn't just the district court that made that ruling. This court expressly upheld that finding, stating that it affirmed because Amazaga had the proration document with authorization, and that should apply to both the trade secret claim and a breach of contract claim. If he had it with authorization, and that's the ruling in this case already by the district court and this court, then he had it for both purposes. And there can't be a claim under MUTSA for retaining it and no claim. It has to be consistent, a claim under both. It either is or it isn't, and it already has been found that he had authority. Your opposing counsel says that there are different standards between the Trade Secrets Act and the breach of contract. Well, I don't see it that way based on the rulings that have been made in this case, that if he was authorized based on the testimony and credibility of witnesses to answer questions about that document, and that those requests were made by April Pearson, the owner of the company, and several other people, Lee Ying and Randy Lazor. And those people, by the way, all did ask questions, not necessarily about that particular document, but they had a whole bunch of questions to ask them. So it was reasonable for him to have it and to respond to questions. Did Mr. Amasago assign his rights to those documents under Section 3.2? What do you mean assign his? I'm sorry. Assign his rights back to AIRPAC, any right he had to those documents. Well, it probably would have come a time when he no longer needed it, too, because time had made them useless, as it was, in fact, the case. But during the time that, in the immediate months after he left, when there was the likelihood of questions about what he did and why, that's why he had the document with him and needed it to answer the questions. And these were based on, as I said, credibility of witnesses. And with respect to the flowcharts, the evidence of trial showed, number one, that Fairportal, that was a company he sent them to, was not a customer or competitor of AIRPAC's. That finding by the district court, in the first opinion, was not appealed. And AIRPAC's contention now that Fairportal might someday become a competitor of AIRPAC's is unsupported by any evidence. And it's contrary to Maryland's rejection of the inevitable disclosure doctrine in the Lejeune case. The evidence also showed that Amazaga did not have the flowcharts when he left AIRPAC's. We know that. Rather, a month later, when he needed something to show Fairportal what kind of work he did, he accessed this Lucidchart website to save himself some time on downloading the flowcharts that he had prepared previously. So the evidence also showed that he prepared the flowcharts simply to help AIRPAC's programmers understand how to deal with tickets that were missing passenger-type information, such as whether it's a child or an adult or military or civilian, and how to deal with that. And that was for purposes of automating the fare-by-rule ticket process. In fact, contrary to what April Pearson testified about those pages of flowcharts, representing the entire processing logic of fare-by-rule ticket processing, Li Ying, the director of product development and senior programmer, said it dealt with only a small part of fare-by-rule logic. And the evidence showed that Ramosaga prepared the flowcharts using his knowledge of the ATPCO rules to try to help AIRPAC automate the audit process. And both Li Ying and Cindy Regan testified that as of the time of trial, more than two years after the creation of the flowcharts, AIRPAC still had not been able to automate fare-by-rule tickets. So that means the AIRPACs either didn't understand the flowcharts and or the flowcharts were inaccurate and or the flowcharts simply were not useful to help with the automation process. Mr. Goldstein, can I ask a question about 6.1 of the agreement that has the language requiring a material breach of a material provision of the agreement? I asked your colleague on the other side, what was the material breach and damage here? And his response essentially was, well, because we're dealing with an employee who was alleged to have taken documents, part and parcel of the damage is the time and expense necessary to make sure that, you know, nothing untoward happened with respect to those documents. And that's an appropriate part of our claim for indemnification. What's your response to that? Well, first of all, 6.1 does require a material breach. Secondly, what actually occurred was that within the first month after Mr. Amazaga left AIRPACs, we sent them an e-mail to their attorney and a forensic guy to explain what they could expect to find on his devices. And the password gave them the devices to go pull whatever they wanted off. And they, in fact, deleted all the documents that we're talking about, the flow charts, the proration documents, and hundreds of other e-mails and correspondence that had AIRPACs in the e-mail address that had nothing whatsoever to do with any of these documents. And so there's no – there was no lengthy process in terms of getting documents back like they make it sound, and that's just not true. And their own – I understood opposing counsel maybe in his brief to make the argument that since this was a contractual relationship with Alaska Airlines, that Alaska Airlines, upon being apprised that certain documents had gone out of the company's control and were held by Mr. Amazaga, required them to make certain changes to maintain the confidentiality of the documents. Is that accurate? No, it's not accurate. The – Lee Ying and our task and the managing director said that they didn't have to make any changes to the documents, any documents as a result of anything Amazaga did. That's the testimony. There's no damages. There's no lost profits. They didn't put on evidence of lost profits. They didn't put on any evidence of forensic damages, which is a requirement of proof of your case. It's not something you get as an expense afterwards. And we cited the cases, one of which they cited, that show that damages for forensic expenses have to be proven as part of your case at trial if you're claiming them. And I specifically asked Ms. Pearson at trial about what damages, if any, they had suffered from any of these documents, and specifically the flowcharts. And she admitted that there were none, that she had no knowledge that any of the documents taken by Amazaga, including the flowcharts, was ever used by him at American Airlines or anywhere else, or that they'd been used by anybody else at all, or that Amazaga ever received compensation for them. And that is the case. And AIRFAX counsel – What about the expenses of when you all sent AIRFAX counsel and forensic technicians this information and they did their work? Would that be a recoverable expense? If they had proved it as damages at trial, it might have been, but they didn't. I don't know what they claim that cost. I will say this, that in the last week I learned that AIRFAX sued its prior attorneys, the ones with Wiley-Rind that handled it up to the time of trial in D.C. Superior Court, alleging malpractice and breach of fiduciary duty, and represented in that complaint that their only two goals in bringing a suit against Amazaga were, number one, to basically get him to lose his job at AIRFAX as a result of his employment contract with – lose his job at American based on his contract with AIRFAX, which they lost and this court upheld, and to get back the documents. They got back the documents at the time of – within a month of filing suit, and as I said, they lost the other claim, and yet they're complaining that Wiley-Rind ran up fees of nearly a million dollars, which is hard to believe, raising all kinds of other issues and unsupported – with unsupported staff needs and claims. And when the basic goals that they say they were after in this case were met early on, and the decision, by the way, on the AIRFAX working at – that Amazaga working at American was over four years ago, it's become apparent that they have other motives in going after this case. They also, by the way, said in that suit against Wiley-Rind that they knew that any monetary claim against Amazaga was substantially or entirely uncollectible. He's an individual young guy. So you wonder what's going on here, and it's clear that I think – I think that it's just a punitive action against Amazaga for leaving AIRFAX. The AIRFAX tried to minimize the testimony of Lee Ying and Ms. Taskin, arguing they didn't know specifically what documents Amazaga took. But Ying was a director of product development and a senior programmer. If Pearson had directed her to make programming changes because of Amazaga, she clearly would have – Lee Ying clearly would have been aware of that fact. Similarly, Taskin was the managing director of AIRFAX and would have known if Amazaga did anything to harm AIRFAX after he left. She didn't say, I don't know, to the questions about damages. She said she was not aware of any harm caused to AIRFAX as a result of anything Amazaga took. And I also would note that in addition to not making a claim for lost profits here, they conceded in closing argument at trial they couldn't prove a conversion claim because it didn't – they couldn't show that Amazaga deprived AIRFAX of any of the documents or the information in them. And AIRFAX also made a number of, as I said, inaccurate statements about the forensic stuff. Its own witness said – confirmed actually what we said, that Amazaga gave full cooperation at the beginning of the case. We sent them an email in June 2015, soon after the case was filed, telling them what documents to look for, gave them his devices, and they acknowledged that they copied and deleted all the documents they wanted off of his devices, even gave us copies because at that point we wouldn't have any copies. And they prepared a spreadsheet of the documents at issue in the case, in the search, including the flow charts, the proration document, the old documents, and so forth. And the spreadsheets, which were made at that time, showed that Amazaga never accessed the old documents in the years since he worked with them. He never accessed the proration spreadsheet. He never sent the documents to anyone else. And that AIRFAX had everything back that it needed. The misrepresentation was made about 16 months of forensic work. It's just not the case. Mr. Goldstein, let me ask you about the trade secrets claim. You said earlier that the court, either our court or the district court, had ruled that your client's retention of the documents that were the subject of the trade secrets claim was authorized. Is that what you said, that it was authorized, the retention? That was with respect to the proration document, that his possession of that post-leaving AIRFAX was authorized, yes. So what's your argument with respect to the royalty damages under the Trade Secrets Act? I mean, the act on its face doesn't seem to require commercial use. I will grant you that it may be difficult to ascertain damages. Well, first of all, they relied on Michelle Riley as an expert to support that.  I'm sorry. So the question is, why would we graft into the statute a requirement of commercial use where that language doesn't appear expressly or otherwise? Because the case law has made it clear that that's what's required, that you have to show some kind of commercial use. Aren't those cases interpreting the common law? And if you've got a statute that on its face doesn't say anything about commercial use, then why should we graft cases that deal with common law trades? Well, you need to have some use. I mean, otherwise, it's not a material breach in the first place. There are other cases. I mean, Justice Gorsuch, Judge Gorsuch seemed to write an opinion in Stagecraft or Stagecoach, something like that, that indicated that the breach was almost an entitlement to some form of damages per se. Well, you're talking about a storage craft technology case, and we addressed it in our brief at pages 50 and 51. But AIRFAX, in arguing that case, ignores the portions of the decision demonstrating why a reasonable royalty was appropriate in that case but not appropriate in this case. The Tenth Circuit said that the defendant's use of the trade secret, in general, matters a great deal in the reasonable royalty analysis. And the court contrasted the situation where a trade secret was disclosed to somebody who didn't or couldn't make use of the secret and, therefore, couldn't do any serious damage with intentionally disclosing it to an able competitor aware that it could be used to compete with the plaintiff. In storage crafts, the defendant had given the secret to a competitor of the plaintiff, which could and did use it to compete with the plaintiff. Fairportal was not a competitor. It didn't use the documents to compete with AIRFAX in any way. It didn't even understand what the documents were for. And so it's not the same situation. And the cases dealing with use of misappropriated information show that somebody has to at least have tried to make use of it. It doesn't have to succeed. You know, if you tried to make use of the trade secret information and got nowhere with it, didn't make any money, yeah, there still can be a valid claim there. But where somebody didn't even try, there's no claim for reasonable royalty. And in any event, as the district court pointed out, Riley's calculations were flawed in many ways. I mean, she based it on the value of the automation of the ticket guard auditing function and the two flowcharts role in automating the auditing of fare-by-rule tickets. But the evidence demonstrated that at the time of trial, two years later, AIRFAX was still unable to automate the fare-by-rule ticket processing. And in addition, the two flowcharts… Mr. Goldstein, you're over a little bit. We gave opposing counsel. Oh, I'm sorry. If there's anything else you want to add quickly, go ahead and do it. No, it's all in the brief. All right. I'll leave it at that. Thank you very much. Thank you. Mr. Hanses, you have some rebuttal time. I would just like to go right to Stagecraft. And Stagecraft says that all you need in order to be entitled to a royalty is disclosure. And then it says, while a defendant in Utah, and, of course, the Utah statute was the same as Maryland's, can't avoid reasonable royalty because he disclosed a trade secret. So you can't avoid it to others without making any commercial use of it. The amount of the royalty damages he must pay undoubtedly depends on the extent to which the trade secret was used. So it affects the damages, not the liability. I don't think anything more than a nominal damage here. Because he wasn't innocent in what he did. He went to Fairportal. Fairportal was a company that Airfax had audited before on behalf of American Airlines. And Fairportal had to pay $10 million to American Airlines because of this audit by Airfax of Fairportal. Fairportal had sold tickets and not properly paid. So what happens is he gets an interview, I guess, with Fairportal or wants to get an interview with Fairportal. That's when he went a month after he was terminated and went in to the online database, used the trade secret, used the password, and took the fare-by-rule flow sheet, which is directly the document that we used to assist to obtain that $10 million audit from Fairportal. So he went in there to get that document to make use of it in his interview with the hope of getting a job. And he knew that he was exposing the company's trade secret, something that was their trade secret, to a company that was a potential competitor or user of Airfax's logic. So I don't think that it's not a situation. The issue isn't whether he used it. The issue is whether he disclosed it in the commercial setting where the value of that trade secret could have been reduced. The other thing that I wanted to point out, Your Honor, was I wanted to make clear here, back to the contract damages, the court goes through, in the court's opinion, and goes through each type of document. In the SBA pro rata framework, the court finds the implicit and says it was implicitly turned over and he had an implicit authorization. But with regard to the fare-by-rule flowcharts on page 18 of the opinion, the Fourth Circuit determined these were trade secret. And the court says because he accessed them after his employment that, therefore, it's not a violation of the obligation to return. Of course, it made the argument that if you go into something after you've left and you're supposed to return them, that's the same thing. And he, in any event, didn't return the user password. So he violated 4.2. And then on page 20 of the opinion, the court says, based on the evidence, the home permission table and straight sales-crossing diver could constitute confidential information, and the defendant was not authorized to retain them. So those are two documents the court specifically said he wasn't authorized to retain. How do you know that he actually retained the user password? Why do we assume that he had it written down somewhere? Couldn't he have simply memorized it? Well, actually, he set it up, Your Honor, when he was employed. So he just kept it. He had a record of it. He was the one who set the whole thing up while he was employed. So he definitely – I mean, he may have memorized it, but while he was employed, he had a record of it. He created it in the first place. So once his employment was over, he had the obligation under the agreement to turn back over the password and certainly not use it anymore and said that that is a piece of information. That he just canceled his account? Well, Your Honor, they should have, of course, and they didn't. But they didn't assume that he was going to go in and turn around and take it and show it to a third party, the document. Let me ask a different question on the forensics discovery damages. Can you tell us where and what in the record shows those damages? Your Honor, the trial counsel asked the court to be able to present attorney's fees and expenses. And the trial court said, not now. We're not going to do that now. We've got to figure out whether you're going to win or not, and then we have to have the Fourth Circuit review the case, and if then, we can come back. I don't think the record specifically says, can I put on testimony of attorney's fees as well as forensic expenses, but I think he did use the word expenses and costs. So that's what the state of the record is. I just want to go back to one other thing. I have 21 seconds here. Again, I believe that the idea that implicit authority, a factual finding here, is inconsistent with the contract and, therefore, is improper, because both the provision requires explicit authority written from the president in order to keep a trade secret, and secondly, the integration clause that says any authority has to be in writing. And we never intentionally raised that right. Thank you. All right. Thank you very much. Thank you. Our court practice is to come down and greet counsel in person, but that's a casualty of COVID, at least at this point. So we'll simply say we appreciate the arguments of both counsel, and if you'll clear your desks, then we'll be ready for the next counsel to come in, and we'll simply stay up here while you do that. Thank you.
judges: G. Steven Agee, Albert Diaz, Henry F. Floyd